Joseph G. Sansone
Chief, Market Abuse Unit
Simona K. Suh
David C. Austin
Melanie A. MacLean
Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
Brookfield Place
200 Vesey Street, Suite 400
New York, NY 10281
(212) 336-9146 (Austin)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>        **Plaintiff,**<br><br>    -against-<br><br>SEBASTIAN PINTO-THOMAZ,<br>ABELL OUJADDOU, and<br>JEREMY MILLUL,<br>        **Defendants.** | No. 18 Civ. ____<br><br><u>COMPLAINT</u><br><br>**JURY TRIAL DEMANDED** |

Plaintiff Securities and Exchange Commission ("Commission") files this Complaint against defendants Sebastian Pinto-Thomaz ("Pinto-Thomaz"), Abell Oujaddou ("Oujaddou"), and Jeremy Millul ("Millul") (collectively, "Defendants") and alleges as follows:

<u>SUMMARY</u>

1. This case involves insider trading by Pinto-Thomaz, Oujaddou, and Millul in advance of the March 20, 2016 announcement (the "Announcement") that The Sherwin-Williams Company ("Sherwin-Williams") had agreed to acquire The Valspar Corporation ("Valspar"). In early March 2016, Pinto-Thomaz, a credit ratings analyst at a major credit ratings agency (the "Credit Ratings Agency"), learned of the impending acquisition when

Sherwin-Williams consulted the Credit Ratings Agency about the deal. Shortly thereafter, Pinto-Thomaz misappropriated this confidential information by tipping his friends Oujaddou and Millul to purchase Valspar securities. After the acquisition was made public, Oujaddou and Millul sold their Valspar securities generating total illicit profits of approximately $300,000.

2.      Pinto-Thomaz began learning material nonpublic information about the acquisition approximately twelve days before the Announcement, when Sherwin-Williams reached out to the Credit Ratings Agency to seek its view on the potential effect of the acquisition on Sherwin-Williams's credit rating.

3.      On the morning of March 8, 2016, within minutes of his first contact with a representative of Sherwin-Williams about the project, Pinto-Thomaz called and then texted Oujaddou. Later that day and in the following days, Pinto-Thomaz continued to work on the project related to the planned Sherwin-Williams transaction with Valspar and to communicate with Oujaddou.

4.      On the morning of March 10, 2016, shortly after communicating with Pinto-Thomaz, Oujaddou made his first purchase ever of Valspar stock, purchasing 1,000 shares in a personal trading account.

5.      Between March 11 and March 18, Pinto-Thomaz continued to communicate with Oujaddou, who purchased an additional 7,630 shares of Valspar stock during that same time period.

6.      Pinto-Thomaz also tipped his friend Millul. In the early morning hours of Sunday, March 13, 2016, just a few days after Pinto-Thomaz first learned of the acquisition, Millul opened a trading account with an online broker-dealer (the "Online Broker"). Prior to this, Millul did not hold a brokerage account.

7.      After communicating with Pinto-Thomaz, Millul, on Wednesday and Friday, March 16 and 18, 2016, purchased 480 shares of Valspar stock and 75 Valspar call options with the expiration date of April 15, 2016.

8.      On Sunday, March 20, 2016, Sherwin-Williams and Valspar announced the acquisition, and on the next trading day, Monday, March 21, 2016, the price of Valspar shares increased by more than 23% over the prior trading day's closing price.

9.      Millul sold all of his Valspar shares and options that same morning, March 21, 2016, realizing a profit of approximately $107,000.  Oujaddou sold his shares later that week, on March 23 and 24, 2016, realizing a profit of approximately $192,000.

## VIOLATIONS

10.      By virtue of the conduct alleged herein, each of the Defendants, directly or indirectly, singly or in concert, violated Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]. Unless the Defendants are permanently restrained and enjoined, they will again engage in the acts, practices, transactions, and courses of business set forth in this Complaint and in acts, practices, transactions, and courses of business of similar type and object.

## NATURE OF THE PROCEEDINGS AND RELIEF SOUGHT

11.      The Commission brings this action pursuant to the authority conferred upon it by Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)] and seeks to restrain and permanently enjoin the Defendants from engaging in the acts, practices, transactions, and courses of business alleged herein.  In addition, the Commission seeks a final judgment (a) ordering the Defendants to disgorge their ill-gotten gains, together with prejudgment interest thereon; and (b) ordering the

Defendants to pay civil monetary penalties pursuant to Section 21A of the Exchange Act [15 U.S.C. § 78u-1].

## JURISDICTION AND VENUE

12.     This Court has jurisdiction over this action pursuant to Sections 21(d), 21A, and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u-1, and 78aa].

13.     Venue lies in this District pursuant to Section 27 of the Exchange Act [15 U.S.C. § 78aa].  Certain of the acts, practices, transactions, and courses of business alleged in this Complaint occurred within the Southern District of New York.  For example, Pinto-Thomaz obtained the relevant material nonpublic information through his work at the New York City headquarters of the Credit Ratings Agency.  Moreover, all three Defendants reside in the Southern District of New York, and resided and worked there during the relevant period.

## DEFENDANTS

14.     **Pinto-Thomaz**, age 33, is a resident of New York, New York.  Since at least 2015, Pinto-Thomaz has served as a junior credit ratings analyst at the Credit Ratings Agency, a nationally recognized statistical rating organization, based in New York, New York.

15.     **Oujaddou**, age 55, is a resident of New York, New York.  Since 2010, Oujaddou has co-owned and co-managed an upscale hair salon in New York, New York.  According to the salon's website, Oujaddou has over 30 years of experience as a professional hair stylist and has worked with numerous celebrities.

16.     **Millul**, age 32, is a resident of New York, New York.  During the relevant time, Millul owned and managed a jewelry boutique with offices in Manhattan's Diamond District.

## RELEVANT ENTITIES

17.    **Sherwin-Williams** is an Ohio corporation headquartered in Cleveland, Ohio, and a major paint and coating manufacturer.  At all relevant times, its common stock was registered with the Commission pursuant to Section 12(b) of the Exchange Act and traded on the New York Stock Exchange under the symbol SHW.

18.    **Valspar** was a Delaware corporation headquartered in Minneapolis, Minnesota, and a major paint and coating manufacturer.  Before its acquisition by Sherwin-Williams, its common stock was registered with the Commission pursuant to Section 12(b) of the Exchange Act and traded on the New York Stock Exchange under the symbol VAL.  On June 1, 2017, Sherwin-Williams completed its acquisition of Valspar.

## FACTS

**A.    Pinto-Thomaz's Relationships with Oujaddou and Millul**

19.    As of March 2016, Pinto-Thomaz and Oujaddou had been friends for years, frequently communicating about personal matters by text message and by phone.

20.    As of March 2016, Pinto-Thomaz and Millul were also long-time friends, frequently communicating about personal matters by text message, phone, and email.

**B.    Pinto-Thomaz Tips Oujaddou and Oujaddou Trades**

21.    As of March 2016, Pinto-Thomaz was employed by the Credit Ratings Agency in its New York City office as a credit ratings analyst since at least 2015.  In that capacity, he was responsible for analyzing the credit rating of Sherwin-Williams, among other issuers.

22.    Pinto-Thomaz owed a duty of trust and confidence to his employer, the Credit Ratings Agency, and was obligated to maintain the confidentiality of information learned in the course of his employment.  Among other restrictions, he was subject to the Credit Ratings

Agency's policy on the treatment of confidential information, which required employees not to disclose confidential information learned in connection with their work, and not to use or share that information for their personal benefit.

23.     Pinto-Thomaz began learning material nonpublic information about the upcoming acquisition of Valspar in or about early March 2016 when Sherwin-Williams reached out to the Credit Ratings Agency to seek its view on the potential effect of the acquisition on Sherwin-Williams's credit rating.

24.     On the morning of March 8, 2016, a representative of Sherwin-Williams called to speak with Pinto-Thomaz in order to set up a meeting between Sherwin-Williams and the Credit Ratings Agency concerning the upcoming acquisition.  At 10:08 a.m., Pinto-Thomaz returned that representative's call and spoke with him for three minutes.  At 10:17 a.m., minutes after his call with Sherwin-Williams, Pinto-Thomaz called and then texted Oujaddou.

25.     After Pinto-Thomaz's initial contacts with the representative of Sherwin-Williams on March 8, 2016, the Credit Ratings Agency and Sherwin-Williams entered into an agreement for "RES," or "Ratings Evaluation Service."  An RES is a service that internal Credit Ratings Agency documents described as "a confidential, committee-based evaluation of the probable effect on a client's credit ratings of a proposed hypothetical strategic initiative before its implementation."  In Sherwin-Williams's case, the service contemplated was a confidential evaluation of the potential effect of the proposed acquisition of Valspar, a major competitor of Sherwin-Williams, on Sherwin-Williams's credit rating.

26.     Information that Sherwin-Williams shared with the Credit Ratings Agency in connection with the RES was material and nonpublic.

27.     Pinto-Thomaz continued to work on the Sherwin-Williams RES project and to receive material nonpublic information about the upcoming Valspar acquisition on March 8, 9, and 10, 2016.

28.     For example, on the morning of March 10, 2016, Pinto-Thomaz received an email from Sherwin-Williams attaching slides with detailed financial data on the proposed merger and bearing the following header:  "RES REVIEW OF VALSPAR ACQUISITION; [THE CREDIT RATINGS AGENCY]; March 10, 2016; THE SHERWIN-WILLIAMS COMPANY; HIGHLY CONFIDENTIAL."

29.     During the same three days, March 8, 9, and 10, 2016, Pinto-Thomaz had multiple additional communications with Oujaddou.

30.     On the afternoon of March 10, 2016, less than an hour after one such communication with Pinto-Thomaz, Oujaddou made his first purchase ever of Valspar stock, purchasing 1,000 shares in a personal trading account.

31.     On March 11, 14, 17 and 18, 2016, Oujaddou made additional purchases of Valspar stock.

32.     Overall, between March 10 and 18, 2016, Oujaddou accumulated a total of 8,630 shares of Valspar stock, investing over $700,000 in the stock in approximately a week. Oujaddou's purchases of Valspar stock were made on the basis of material nonpublic information tipped to him by Pinto-Thomaz.

33.     The investment was unusual for Oujaddou.  His purchase of Valspar stock between March 10 and 18, 2016, was by far his largest investment in a single issuer's securities in a short span of time since at least 2010.  It was also substantially larger than any other investment he made during that time period, aside from his frequent investments over the course

of multiple years in the stock of a major technology company (the "Technology Company").

Indeed, Oujaddou liquidated substantial portions of his investment in the Technology Company

to fund his Valspar stock purchases.

**C.      Pinto-Thomaz Tips Millul and Millul Trades**

34.      In the days preceding the Announcement, Pinto-Thomaz also tipped material

nonpublic information about the Valspar acquisition to his friend Millul.

35.      On Sunday, March 13, 2016, at approximately 4:34 a.m., Millul opened a

brokerage account with the Online Broker.  Prior to opening this account online, Millul did not

hold a brokerage account or trade on his own behalf.

36.      The next day, March 14, 2016, Pinto-Thomaz and Millul communicated

electronically using their personal electronic devices.

37.      Two days later, on March 16, 2016, Millul called the Online Broker to request

permission to purchase options and trade on margin in his brand new account.  That same day,

Millul also wired $100,000 into his account at the Online Broker as an opening deposit and

immediately purchased 480 shares of Valspar stock for approximately $40,000.

38.      On Friday, March 18, 2016, after Millul received authorization to trade options,

he also purchased 75 out-of-the-money Valspar call options, expiring on April 15, 2016, with the

strike price of $90, for approximately $4,500.

39.      Millul's purchases of Valspar stock and options were made on the basis of

material nonpublic information tipped to him by Pinto-Thomaz.

**D.      Oujaddou and Millul Profit from Their Illegal Trades**

40.      At 1:00 p.m. on Sunday, March 20, 2016, Sherwin-Williams and Valspar

announced the acquisition.  On the Monday following the Announcement, the price of Valspar

shares increased by $19.39, or 23.13%, from the prior trading day's closing price of $83.83 per share, to close at $103.22 per share.

41.     Millul sold all of his Valspar stock and options that same morning, March 21, 2016, realizing a profit of approximately $107,000.

42.     Oujaddou sold his shares of Valspar stock later that same week, on March 23 and 24, 2016, realizing a profit of approximately $192,000. Oujaddou then immediately reinvested a large portion of those proceeds in the stock of the Technology Company.

**E.      Pinto-Thomaz Lies in Response to a FINRA Inquiry**

43.     Shortly after the Announcement, on June 9, 2016, at the request of the Financial Industry Regulatory Authority ("FINRA"), an employee of the Credit Ratings Agency emailed Pinto-Thomaz, along with certain other employees who worked on the Sherwin-Williams RES, a list of individuals and entities (the "FINRA List") and asked the recipients if they knew any of the persons on the list. Oujaddou's and Millul's names both appeared on the FINRA List. The email requested that all recipients respond by June 17, 2016.

44.     On the afternoon of June 14, 2016, after receiving a reminder to respond to the inquiry about the FINRA List, Pinto-Thomaz replied to the inquiry by email, stating: "No relationship exists between myself and the individuals/entities listed." Nine minutes later, Pinto-Thomaz sought to recall the email, and then sent a revised response stating: "To the best of my knowledge, no relationship exists between myself and the individuals/entities listed."

**F.      Pinto-Thomaz, Oujaddou, and Millul Acted with Scienter**

45.     At all relevant times, the Credit Ratings Agency's policies required that its employees, including Pinto-Thomaz, maintain the confidentiality of client-related information and not use this information to trade in securities, or disclose it to others.

46.     Pinto-Thomaz provided tips about the Valspar acquisition to Oujaddou and Millul in breach of his obligations under the Credit Ratings Agency's policies and in breach of his duty of trust and confidence to the Credit Ratings Agency.  Pinto-Thomaz knew or recklessly disregarded that he breached these duties by disclosing the material nonpublic information to Oujaddou and Millul.

47.     Pinto-Thomaz received a personal benefit from his tips of material nonpublic information to his friends Oujaddou and Millul, including but not limited to the benefit of providing gifts of the information to two close personal friends.  Pinto-Thomaz also knew or recklessly disregarded that Oujaddou and Millul would trade on Pinto-Thomaz's tips.

48.     Oujaddou and Millul each knew, were reckless in not knowing, should have known, or consciously avoided knowing that the tips that Pinto-Thomaz provided to them were conveyed in breach of a fiduciary duty, or a similar obligation arising from a relationship of trust and confidence.

49.     Oujaddou and Millul purchased Valspar securities on the basis of Pinto-Thomaz's tips while knowing, or while reckless in not knowing, that the information they received from Pinto-Thomaz was material and nonpublic.

### FIRST CLAIM FOR RELIEF
**Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder
(Against All Defendants)**

50.     The Commission realleges and incorporates by reference herein paragraphs 1 through 49 above.

51.     The Defendants, directly or indirectly, singly or in concert with others, in connection with the purchase or sale of securities, by the use of the means or instrumentalities of interstate commerce, or of the mails or the facilities of a national securities exchange, with scienter:  (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of a

material fact or omitted to state a material fact necessary in order to make the statement made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

52.    By reason of the foregoing, the Defendants, directly or indirectly, singly or in concert with others, each violated, and unless enjoined will again violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## **PRAYER FOR RELIEF**

**WHEREFORE**, the Commission respectfully requests that this Court enter a Final Judgment:

### I.

Permanently restraining and enjoining each of the Defendants and their respective agents, servants, employees and attorneys and all persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise from violating Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

### II.

Ordering the Defendants to disgorge all of the unlawful trading profits and all other ill-gotten gains resulting from the violations alleged in this Complaint, and ordering each of them to pay prejudgment interest thereon.

### III.

Ordering each of the Defendants to pay civil monetary penalties pursuant to Section 21A of the Exchange Act [15 U.S.C. § 78u-1].

## IV.

Granting such other and further relief as this Court may deem just and proper.


Dated: New York, New York
       June 26, 2018

Joseph G. Sansone
Simona K. Suh
David C. Austin
Melanie A. MacLean

SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
Brookfield Place
200 Vesey Street, Suite 400
New York, New York 10281-1022
(212) 336-9146 (Austin)
austinda@sec.gov